Filed 9/5/13  P. v. Chavez CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E054719 |
| v. | (Super.Ct.No. RIF10002353) |
| JOSEPH ANGEL CHAVEZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Robert E. Law, Judge. (Retired judge of the former Orange Mun. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed in part; reversed in part with directions.

David Andreasen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Andrew Mestman and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant and appellant Joseph Angel Chavez guilty of attempting to deter an executive officer from performing his duties or resisting an executive officer by force or violence (Pen. Code, § 69),[1] willfully resisting a peace officer (Pen. Code, § 148, subd. (a)(1)), and being under the influence of a controlled substance (Health & Saf. Code, § 11550, subd. (a)).  Defendant admitted suffering a prior strike conviction (§§ 667, subds. (c) & (e)(1), 1170.12, subd. (c)(1)), and three prior convictions for which he served prison terms (§ 667.5, subd. (b)).  The trial court sentenced defendant to prison for a term of five years, eight months.[2]

Defendant raises 15 issues on appeal.  First, defendant contends the trial court erred by denying his motion concerning the State's failure to gather and preserve evidence.[3]  Second, defendant asserts the trial court erred by ruling evidence of a deputy's prior use of excessive force could be admitted contingent on defendant testifying.  Third, defendant contends the trial court erred by admitting evidence of defendant's prior conviction for resisting arrest.

---

[1]  All subsequent statutory references will be to the Penal Code unless otherwise indicated.

[2] The second amended abstract of judgment reflects defendant's prison term is four years, eight months.

[3]  See *Arizona v. Youngblood* (1988) 488 U.S. 51, 57-58 (*Youngblood*); *California v. Trombetta* (1984) 467 U.S. 479, 488-489 (*Trombetta*).

2

Fourth, defendant asserts the trial court erred by permitting a deputy to testify regarding his opinion that defendant was attempting a burglary and that defendant was especially dangerous due his prior prison commitment. Fifth, defendant contends the prosecutor committed misconduct by attempting to distract and inflame the jurors by using evidence of defendant's tattoos as proof defendant is a violent person. Sixth, defendant asserts the jury was incorrectly instructed on the resistance charges because there was not substantial evidence that the initial detention was lawful.

Seventh, defendant contends the trial court did not correctly instruct the jury on the law of a proper search and seizure. Eighth, defendant asserts the trial court erred by incorrectly instructing the jury on a defendant's right to respond to excessive force by a peace officer. Ninth, defendant asserts the trial court erred by giving ex parte responses to jury questions without notifying counsel. Tenth, defendant contends the trial court erred by coercing the jury into reaching a verdict. Eleventh, defendant asserts the cumulative effect of the foregoing 10 alleged errors created a denial of due process.

Twelfth, defendant contends his conviction for resisting a peace officer (§ 148, subd. (a)(1)) must be vacated because it is a lesser included offense of resisting an executive officer by force or violence (§ 69). Thirteenth, defendant asserts that if section 148 is not a lesser included offense of section 69, then the sentence related to his section 148 conviction must be stayed. (§ 654.) Fourteenth, defendant requests this court conduct an independent review of the in-camera hearing on defendant's *Pitchess*[4]

---

[4] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

3

motion. Fifteenth, defendant asserts Judge Law should be disqualified from presiding over this case if it were to be remanded. We affirm in part and reverse in part with directions.

## FACTUAL AND PROCEDURAL HISTORY

### A. CURRENT CASE

On March 24, 2010, Riverside County Sheriff's Deputy Davis (Davis) was dispatched to the unincorporated Rubidoux area of Riverside County. The dispatch was made in response to a woman calling law enforcement due to a "gangster-looking" man carrying a pillowcase, knocking on the woman's door, asking to borrow an electrical cord, and claiming to live next door to the woman in a house the woman knew to be vacant. Davis drove his black and white patrol car to the Rubidoux neighborhood at approximately 12:30 p.m.

While driving, Davis saw defendant walking down the street, toward the patrol car, and holding a pillowcase. Davis believed defendant was "probably burglarizing something." As defendant was walking, Davis recognized defendant as an active parolee due to Davis reviewing the parolee database while on duty. Davis is more cautious with people who are on parole because he is more concerned for his safety when dealing with them.

Davis parked his patrol car on the street. Defendant stopped in front of the car. Davis, who was in uniform, spoke to defendant and, in order to begin the process of patting him down, started placing defendant's hands behind his back. As Davis put defendant's hands behind his back defendant pulled his arms from Davis's grasp,

4

shoved the deputy, and then ran down the street. Davis chased after defendant in his patrol vehicle and then on foot once defendant ran through a residential backyard. Defendant tried to jump over the backyard fence, but he was unable to do so because the plank at the top of the fence broke or he lost his grip.

Davis was approximately 15 feet away from defendant when defendant failed in his attempt to jump over the fence. Davis instructed defendant to "'Get on the ground. Show me your hands.'" Defendant yelled, "'Why? Why?'" Defendant did not comply with Davis's instructions. Davis removed his gun from its holster, because defendant had not been patted down and he was not complying with Davis's instructions. For example, defendant never moved onto the ground. Davis was concerned for his safety.

Davis sprayed defendant's face with pepper spray from a distance of 10 to 15 feet. Davis's partner, Deputy Broda (Broda) arrived at the backyard. Broda grabbed defendant, and Davis also grabbed defendant. Defendant pulled his arm away from Davis, and then punched Davis on the left side of his face. Davis tried to hit defendant with a rapid containment baton, but missed and hit a wall. Davis swung the baton at defendant a second time and struck defendant's arm. Defendant did not react but he began moving away from the deputies. Davis continued telling defendant to comply with his orders.

Broda said, "'Taser, taser,'" to announce his intention to tase defendant, so Davis moved away. Broda deployed the taser, the two taser prongs connected with defendant, but not at the same time. The taser did not appear to have any effect on defendant. Defendant pulled the taser prongs off of his clothing. It is unclear if the taser prongs connected with defendant's skin. Davis punched defendant three or four times.

Davis and defendant began wrestling on the ground. Defendant pulled Davis's leg towards defendant's face, possibly in an attempt to bite the deputy. Davis struck defendant's face with an open hand three or four times, in an attempt to stop defendant from pulling his leg. Broda removed the prongs from the taser and "dry stunned" defendant five times by applying the taser directly to defendant's skin without the barbs. The dry stuns did not affect defendant. Eventually, Davis was able to move one of defendant's arms behind his back, while Broda moved defendant's other arm behind his back. Broda forcefully held defendant's hands behind his back, in order to place defendant in handcuffs.

Davis called for paramedics, due to defendant being dry stunned, tased, and hit. Defendant was handcuffed to a gurney and taken to a hospital. Defendant told medical personnel he swallowed a gram of methamphetamine. While on the gurney, defendant was sweating, rocking back and forth, speaking rapidly, and his pulse was "well over 100 beats a minute." Davis believed defendant was under the influence of a stimulant. Defendant's blood tested positive for amphetamines. Defendant suffered two lacerations on his face and two welts on his back.

6

The prosecutor asserted the charge of resisting an executive officer from performing his duties by force or violence (§ 69) concerned defendant's initial interaction with Davis wherein defendant shoved Davis prior to running away. The prosecutor argued the charge of willfully resisting a peace officer, without force (§ 148, subd. (a)(1)), related to defendant's act of running away from Davis. Defendant argued Davis used excessive force, and therefore was not lawfully performing his duties. Defendant faulted Davis for attempting to search defendant (1) before confirming defendant was on parole, and (2) without telling defendant why he was conducting the search. Further, defendant asserted prior testimony reflected defendant only pushed Davis's hand away—he did not shove the deputy in order to run away.

B.    PRIOR CASE

On July 4, 2000, Riverside County Sheriff's Deputy Williamson (Williamson) was on patrol, wearing a uniform, and driving a black and white patrol car. At approximately 11:30 p.m., Williamson saw a car parked along the street with a person lying down in the passenger seat. As Williamson approached the car, the car left the parking space at a higher rate of speed than Williamson would consider to be normal. Defendant was left standing near where the car had been parked. Williamson spoke to defendant. Defendant agreed Williamson could search him.

Williamson placed defendant's hands behind his back, and held them with one of his own hands, in order to begin patting down defendant. Defendant appeared to be under the influence of a controlled substance; when Williamson asked defendant his name, defendant responded unintelligibly. As Williamson began the pat-down,

7

defendant turned, raised an elbow, and then ran away. Williamson chased after defendant, but was unable to locate him.

Williamson and a crime analyst searched several databases to find a match for the tattoos Williamson saw on defendant's face and neck. Williamson identified defendant as the person who ran away from him. Williamson learned defendant was on parole. Williamson spoke to defendant's parole agent, and a parole hold was placed on defendant. A parole hold is similar to an arrest warrant.

In August 2000, Riverside County Sheriff's Deputy Albaran (Albaran) was on patrol, in the Rubidoux area, in a marked patrol car. In the patrol car, Albaran had a copy of defendant's wanted flier. At approximately 8:00 p.m., Albaran saw defendant walking down a street. Albaran stopped his car near defendant and shined a spotlight on him. Defendant turned around and ran into an apartment. Albaran used his radio to request assistance. Deputy Barajas (Barajas) arrived to assist Albaran.

Barajas located defendant inside one of the apartments. Barajas radioed that he was holding defendant at gunpoint. Albaran arrived at the apartment and also drew his gun. Defendant was following orders given by Barajas, such as lying on the ground. Barajas then instructed defendant to stand up and put his hands on top of his head. Defendant stood up, and Barajas tried to holster his gun in order to handcuff defendant, but the two began fighting.

The fight began in the kitchen. Defendant was reaching on the countertops "for anything he could get his hands on." Albaran yelled for Barajas to leave the kitchen; it appeared defendant was reaching for a knife, and the kitchen was too small of a space for Albaran to shoot defendant. Defendant yelled, "'You're not fucking taking me.'"

The fight moved into the living room. It was a "knock down, drag out fight . . . all over that living room," with punching and kicking. Albaran sprayed defendant with a chemical agent from a distance of two or three feet, but it only increased defendant's fury. Albaran feared for his and Barajas's lives. Defendant was sweating profusely and his clothes were coming off. The fight continued in the living room. At one point, defendant managed to throw the two deputies off him, and ran toward the apartment's entry door.

Just as defendant was exiting through the door, Sergeant Bracey was running toward the door. Defendant collided with Sergeant Bracey, and thus was kept in the apartment. Defendant continued fighting the three law enforcement officers. Eventually, with the help of a fourth deputy, they were able to handcuff defendant. It took all four law enforcement officers to place defendant in handcuffs. Albaran was able to recall the incident after 11 years because during his 14 years as a law enforcement officer, the fight with defendant "was way by far the worst fight that [he had] ever been in." Defendant suffered swelling on his face and a bloody nose. Barajas suffered a hand injury. Albaran had cuts on his hand.

# DISCUSSION

## A.    *TROMBETTA/YOUNGBLOOD* MOTION

### 1.    *PROCEDURAL HISTORY*

Prior to trial, defendant filed a motion asserting his due process rights had been violated because the State willfully destroyed evidence. Defendant explained Sergeant Marks obtained a recording of the 911 call and related "audio traffic," in the instant case, as well as dispatch logs and a computer generated printout of the call. Marks listened to the audio recording and then booked the items into evidence. When an investigator from the district attorney's office tried to retrieve the audio recording and report from the Sheriff's property room, the items could not be located.

Defendant argued the audio recording was important because "it establishes a basis for the officer to contact the defendant at all, and whether the defendant matched the description" given by the reporting party. Defendant asserted the dispatch logs were necessary to prove "the sequence of events and time frame."

At a hearing, the trial court and the parties speculated, but agreed, that the evidence was likely still in the Sheriff's property room but that it could not be located and "[t]here's just no way to retrieve it." The trial court described the Sheriff's property room as a place "where evidence goes to die." The prosecutor explained that Marks prepared a report about the audio recording based upon listening to the recording.

Defendant expressed concern that Marks's report about the audio traffic (discussion between Davis and dispatch) only covered words that were said and not background noise. Defendant believed the background noises might provide context to

10

what was happening during defendant and Davis's interaction. The trial court stated it wanted to hear from Marks about whether any exculpatory information was on the recordings, and why the evidence could not be retrieved from the property room. The prosecutor said he would try to schedule "somebody" to testify for the evidentiary hearing.

The following day, the prosecutor stated the dispatch logs were located. The logs are "drafted by a dispatcher so when somebody calls 911, anything that's said is printed out on this catalog." The prosecutor did not have the audio recording—just the printout. The trial court said to defense counsel, "So I do not think you have a *Trombetta* issue if they have a printout. [¶] And you'd say, 'Yeah, I agree.' Right?" Defense counsel responded, "Um, well, we'll see, your Honor." The trial court said, "Well, in any event, okay. That should—that may resolve the problem. You will present it as an exhibit, and I don't know what I'll do yet. [¶] But the next thing I want to do is pick the jury."

Several days later, defense counsel asked the trial court to clarify if it denied the *Trombetta* motion. The trial court said, "Yeah, I think so." The court explained the printout was available, but the audio recording "disappeared in the [Sheriff's] evidence locker. [¶] . . . [¶] . . . Where things go to disappear." The court then moved on to discussing the content of the dispatch logs and whether certain information needed to be redacted, such as defendant appearing to be "a gangster-looking person."

2.    *ANALYSIS*

a)    Contentions

Defendant contends the trial court erred by (1) denying his

*Trombetta/Youngblood* motion, and (2) not conducting an evidentiary hearing on the

motion.  The People contend defendant forfeited the *Trombetta* issue for appeal by not

pushing for an evidentiary hearing after the prosecutor produced the transcript of the

dispatch logs.  We agree with the People.

b)    Forfeiture Law

"A fundamental tenet of our system of justice is the well-established principle

that a party's failure to assert error or otherwise preserve an issue at trial ordinarily will

result in forfeiture of an appeal of that issue.  '"The purpose of the general doctrine of

waiver is to encourage a defendant to bring errors to the attention of the trial court, so

that they may be corrected or avoided and a fair trial had."'  [Citation.]" (*People v.

McKinnon* (2011) 52 Cal.4th 610, 636, fn. omitted.)

c)    Standard of Review

"The standard of review of a trial court's determination that evidence is or is not

sufficiently exculpatory under *Trombetta* and *Youngblood* is unsettled, and it may

depend on the extent of the inquiry a court takes before ruling on a *Trombetta* motion."

(*People v. Velasco* (2011) 194 Cal.App.4th 1258, 1262.)  "It is settled that the

substantial evidence standard applies to a trial court's determination, following a factual

inquiry, that the state acted in good or bad faith in failing to preserve evidence.

[Citation.]" (*Ibid.*)  However, it is unclear what standard of review applies when a

12

hearing is not conducted. (*Ibid.*) For the sake of caution, we will apply the de novo standard of review. (*U.S. v. Cooper* (9th Cir. 1993) 983 F.2d 928, 930-931 [applying de novo standard of review although a factual inquiry took place].)

d)      *Trombetta/Youngblood* Law

"Under *Trombetta* and *Youngblood*, 'Law enforcement agencies must preserve evidence only if it possesses exculpatory value "apparent before [it] was destroyed," and not obtainable "by other reasonably available means." [Citations.] The state's responsibility is further limited when the defendant challenges the failure to preserve evidence "of which no more can be said than that it could have been subjected to tests" that might have helped the defense. [Citation.] In such a case, unless the defendant can show "bad faith" by the police, failure to preserve "potentially useful evidence" does not violate his due process rights.' [Citation.]" (*People v. Velasco*, *supra*, 194 Cal.App.4th at p. 1262.)

e)      Analysis

The dispatch logs do not appear on the prosecution's or defense's exhibit lists. The record does not include a clerk's exhibit list. There is nothing reflecting in the record that the dispatch logs indicate the sounds of a struggle taking place, such that there would be exculpatory evidence of Davis applying excessive force to defendant. For example, transcripts will sometimes indicate, "Unintelligible. Background noise." It appears to be only defendant's speculation that exculpatory material may be on the audio recording. Thus, defendant needs to show bad faith on the part of law enforcement for failing to preserve the evidence.

13

It is at this point that we encounter a forfeiture problem. Defendant did not request a hearing on the issue of bad faith. Trial counsel and the trial court agreed the evidence likely still existed but was lost in the Sheriff's property room. The trial court commented about evidence regularly "dying" and "disappearing" in the Sheriff's property room; however, these discussions are not evidence. There is nothing for this court to look at when conducting a de novo review concerning the bad faith issue. By failing to request a hearing, or at least making an offer of proof, we are left with nothing to review. (*People of Territory of Guam v. Muna* (9th Cir. 1993) 999 F.2d 397, 400 [burden is on defendant to show government's bad faith].) As a result, we conclude defendant forfeited the issue on appeal.

Defendant presents the following argument: Marks listened to the recording before it disappeared. Therefore, to the extent there was exculpatory information on the recording, Marks was aware of it. Defendant then asserts, "So if the recording was exculpatory, bad faith was present." Defendant's reasoning is problematic. We do not know whether the recording contained exculpatory information, which is why we have moved our analysis to the next step: was there bad faith? Defendant's argument is moving in a circle, in that he is using the speculation about possible exculpatory information to support the argument about bad faith. Rather than circling back to speculating about the possible exculpatory nature of the evidence, defendant needs to explain if there is evidence of animus between him and the deputies, or evidence of a calculated or conscious decision to destroy the evidence. (*Trombetta*, *supra*, 467 U.S. at p. 488 ["The record contains no allegation of official animus towards respondents or of

14

a conscious effort to suppress exculpatory evidence"].) Accordingly, we find defendant's argument to be unpersuasive.

Next, defendant asserts the circumstances surrounding the recording's disappearance are suspicious because (1) Lieutenant Ybarra, who seemingly is not connected with the case, was the last person to check out the recording before it disappeared, (2) the evidence was supposedly lost for a year, but the dispatch logs were located within a day of the motion hearing, and (3) the transcript was separated from the audio recording despite the items being booked into evidence together, under the same barcode number. Defendant's argument lacks record citations, and we are unable to locate any *evidence* supporting these assertions. It appears defendant is relying on comments made during the hearings and the argument in defendant's trial court motion brief, as opposed to statements made under oath by witnesses. While we appreciate defendant may fault the trial court for not holding a hearing that would permit him to have testimony, we are again confronted with the problem that defendant did not request a hearing on the bad faith issue. Thus, we are again confronted with the issue of forfeiture, and therefore find defendant's argument to be unpersuasive.

B.     EVIDENCE OF DAVIS'S PRIOR USE OF EXCESSIVE FORCE

1.     *PROCEDURAL HISTORY*

Prior to the start of trial, the prosecutor informed the trial court that defendant had previously brought a *Pitchess* motion. As a result of that motion it was discovered that Davis's file included an allegation of excessive force from 2005 or 2006; however, the allegation was deemed unfounded by the Sheriff's Department and Davis was not

15

disciplined as a result of the incident. The prosecutor asserted the excessive force evidence was not relevant and improper character evidence.

Defendant explained he planned to present a statement from Enrique Mendoza who alleged Davis punched him two times after Mendoza was in handcuffs. Defendant asserted the allegations were deemed unfounded by the Sheriff's Department only because Mendoza grew tired of pursuing the claim. Defendant argued the evidence was relevant because his defense theories were excessive force by Davis and self-defense. Defendant argued Mendoza's excessive force allegation "goes to the crux of the defense."

The trial court said it could not rule on the motion because it did not "know what's going to be said by the defense." The trial court said it would not speculate about the defense's case, and it would wait until evidence was presented at trial to determine whether Mendoza's statement became relevant. The trial court explained, "It's not appropriate until you have a foundation that makes it appropriate and relevant. Obviously the defendant is the only person that can do that . . . . If he does not testify, then it never gets in."

The following day, the prosecutor again raised the issue of prior excessive force allegations against Davis. The prosecutor explained that he wanted to be the person to ask Davis about the allegations, if the evidence were deemed admissible. Thus, the prosecutor asked the court to make a determination as to whether the evidence would be admissible pursuant to Evidence Code section 352. The prosecutor argued evidence of the prior incident would be improper character evidence.

16

Defendant argued the evidence "goes specifically to negate elements of the offense itself," because it would show Davis was not lawfully executing his duties. Further, defendant asserted the evidence supported an assertion of self-defense on the part of defendant. Defendant asserted he should be permitted to cross-examine Davis on the prior allegation of excessive force.

The trial court did not change its prior decision. The court explained it could not know if the evidence was relevant until defense evidence was presented at trial. The trial court said, "Once again, no motion in limine, no decision on the evidence at this time until the case plays itself out, and the issue raises itself. So sometimes in limines don't get granted, and we just wait and see what the evidence shows. Sorry."

Several days later, defense counsel asked the trial court to clarify its ruling. Defense counsel asked whether she could cross-examine Davis about Mendoza's excessive force allegation. The trial court responded, "Well, my tentative ruling is I don't see how it's going to be relevant to this case." Defense counsel argued the evidence was relevant because it negated elements of a charged offense. Defense counsel then said, "But if the Court is going to rule it's not admissible, I just want to know so I do not get into it." The trial court clarified, "If time passes and it becomes obvious it's important, I get to change my mind." Defense counsel responded, "Okay."

After Davis completed his testimony, defense counsel again moved to present Mendoza's testimony. Counsel argued Davis denied ever using force against a person who was not using force against him. Counsel asserted Mendoza's testimony would impeach Davis and negate elements of a charged offense. Defense counsel asserted

17

Mendoza should be allowed to testify regardless of whether defendant testified. The trial court responded, "Same ruling. I think not." The trial court explained the evidence was irrelevant.

2. *ANALYSIS*

Defendant contends the trial court erred by not admitting evidence of Mendoza's prior abuse allegations against Davis unless defendant testified. The People focus their argument on harmless error, arguing defendant has failed to show a different outcome would have likely occurred if Mendoza's allegations had been presented at trial. We conclude the alleged error was harmless.

A trial court "in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) "'A trial court's exercise of discretion in admitting or rejecting evidence pursuant to Evidence Code section 352 "will not be disturbed on appeal unless there is a manifest abuse of that discretion resulting in a miscarriage of justice." [Citation.]' [Citation.]" (*People v. Thomas* (2011) 51 Cal.4th 449, 485.)

Since the People focus their argument on harmless error, we will assume the trial court erred by not permitting defendant to present evidence of Mendoza's prior abuse allegations against Davis. Therefore, we must consider if the error was harmless. Where a "trial court's ruling did not constitute a refusal to allow [a] defendant to present a defense, but merely rejected certain evidence concerning the defense . . . the proper

standard of review is that enunciated in *People v. Watson* [(1956)] 46 Cal.2d 818, 836. [Citation.]"  (*People v. Bradford* (1997) 15 Cal.4th 1229, 1325 (*Bradford*).)

In the instant case, defendant presented photographs of his body and details of the injuries he received, including the fact that he was hospitalized.  Defendant questioned Davis about Davis's past use of excessive force.  Additionally, the trial court instructed the jury that defendant had the right to defend himself against an officer's use of unreasonable or excessive force.  (CALCRIM No. 2670.)  Since defendant was able to present his defense, but was denied a certain piece of evidence concerning that defense, we apply the *Watson* standard.  Under the *Watson* standard, we must consider whether it is reasonably probable the verdict would have been more favorable to defendant if the trial court had admitted evidence of Mendoza's prior abuse allegations against Davis.  (*Bradford*, *supra*, 15 Cal.4th at p. 1325.)

We conclude it is not reasonably probable a result more favorable to defendant would have occurred but for the trial court's error, because the evidence supported a finding that defendant resisted Davis prior to the fight in the residential backyard. Defendant could have been found guilty of resisting Davis based upon defendant running away from Davis when Davis was attempting to handcuff defendant.  The evidence reflects Davis started placing defendant's hands behind his back, but defendant pulled his arms from Davis's grasp, shoved the deputy, and then ran down the street. Davis chased after defendant.

19

Accordingly, even if defendant had presented evidence of Mendoza's allegations against Davis, it is not reasonably probable a more favorable result would have occurred, because Davis had not used any force at the time defendant could have been found to have completed the charged offense. Thus, we conclude any error was harmless.

C.     EVIDENCE OF PRIOR ACT OF RESISTING ARREST

1.     *PROCEDURAL HISTORY*

Prior to the start of trial, the prosecutor moved to present evidence of defendant's prior act of resisting arrest, wherein four deputies were needed to place him in handcuffs. (Evid. Code, § 1101, subd. (b).) The prosecutor asserted the evidence was relevant to show defendant's intent and lack of mistake. In the trial court's tentative ruling, it stated the evidence would be admissible because it is relevant to show defendant was not mistaken about Davis being a law enforcement officer. The trial court tentatively concluded the evidence was admissible for "two bases, content and lack mistake." We infer "content" means "intent."

Defendant argued the prior offense evidence was not relevant to prove intent because the charged offenses were general intent crimes. As to mistake, defendant argued the evidence was not relevant because the defense was not raising mistake as an issue. The trial court responded that defendant put every element of the offense at issue by pleading not guilty, and therefore the trial court could not limit the prosecutor by the issues defendant chose to make larger than others.

20

Defendant argued the prior offense was factually dissimilar from the charged offense because (1) the prior offense was "ten years old," and (2) the crimes involved different deputies. The trial court ruled the prior offense evidence was admissible.

2.      *ANALYSIS*

Defendant contends the trial court erred by admitting evidence of his prior act of resisting arrest. We disagree.

"Evidence of prior uncharged acts is inadmissible to prove the defendant's bad character, but may be admitted if relevant to prove motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident, among other facts. [Citations.]" (*People v. Lopez* (2011) 198 Cal.App.4th 698, 714.) "'The trial court has the discretion to admit evidence of crimes committed by a defendant other than the one for which he is charged, if such evidence is relevant to prove some fact at issue, and if the probative value of the evidence outweighs its prejudicial effect. [Citation.] "When reviewing the admission of evidence of other offenses, a court must consider (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant,"'" such as Evidence Code section 352. (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1372-1373.) We review the trial court's evidentiary ruling for abuse of discretion. (*Id.* at p. 1373.)

21

We begin by considering the issue of materiality. Prior to the start of trial, while arguing against the introduction of the prior crimes evidence, defendant said he planned to rely on a theory of self-defense. In closing arguments defendant argued a theory of self-defense. In order to be acquitted on a theory of self-defense, a defendant must prove he reasonably believed that he was in imminent danger of suffering bodily injury and reasonably believed that the immediate use of force was necessary to defend against that danger. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)

By arguing a theory of self-defense, defendant made his state of mind a disputed issue. Whether defendant reasonably believed he needed to defend himself was a material fact that the prosecution was required to disprove in order for the jury to find defendant guilty of the charged crimes. Accordingly, the prior offense evidence related to a material fact—defendant's state of mind.

Second, we address the probative value of the prior offense evidence. "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or *self-defense* or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' [Citation.]" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402, italics added.)

22

The prior offense evidence reflects that in July 2000, as Deputy Williamson began to pat-down defendant, defendant turned, raised an elbow, and then ran away. Williamson chased after defendant, but was unable to locate him. In August 2000, Deputy Albaran stopped his patrol car near defendant and shined a spotlight on him; defendant turned around and ran into an apartment. In the current case, in March 2010, as Davis was placing defendant's hands behind his back, defendant pulled his arms from Davis's grasp, shoved the deputy, and then ran down the street. Davis chased after defendant in his patrol vehicle and then on foot once defendant ran through a residential backyard.

The prior offenses are similar to the charged offense because they all involve defendant running away from a deputy during the initial contact, and appearing to be under the influence of a controlled substance. In July 2000, defendant appeared to be under the influence of a controlled substance. In August 2000, four officers were needed to place defendant in handcuffs. In the current case, defendant tested positive for amphetamines, and two deputies were needed to place defendant in handcuffs.

The current case concerns defendant's third time running away from an officer during the first moments of contact. The prior offense evidence is probative because it tends to negate defendant's claim that he was acting in self-defense when shoving Davis and running away, and it tends to prove defendant had a criminal mindset in committing the charged acts—not an innocent mindset of self-defense.

Third, we consider the possible prejudicial effect of the evidence. Prior offense evidence is prejudicial when it requires an undue consumption of time, or creates a substantial danger of confusing the issues or of misleading the jury. (*People v. Leon* (2008) 161 Cal.App.4th 149, 168.) The prior crime evidence was presented via the testimony of two witnesses. Since there were only two witnesses, the prior offense evidence was not a danger for consuming a great deal of time.

As to confusing or misleading the jury, the crimes occurred 10 years apart, and the deputies involved in the July 2000, August 2000, and March 2010 incidents all testified. Thus, it should have been clear to the jury that the incidents were separate due to the lapse in time and different deputies involved. As a result, there was not a substantial risk of the jury being confused or misled by the prior crime evidence. In sum, the trial court's decision to admit the prior crime evidence was within reason. Therefore, we conclude the trial court did not err.

Defendant contends the trial court erred because it failed to weigh the prejudicial effect of the prior offense evidence against the probative value of the evidence. During the discussion about admitting the evidence, the trial court asked the attorneys if they had read *People v. Ewoldt*, *supra*, 7 Cal.4th 380, because it contained an "[e]ighteen-page explanation of [Evidence Code section] 1101 and how all of it plays together by [the] California Supreme Court." Thus, the trial court was familiar with the case law related to prior crimes evidence. Nevertheless, the fact is that the record is silent about the trial court's views on the prejudicial effect of the prior offense evidence. We do not assume there is an error when the record is silent; rather, we presume the trial court was

aware of and followed the applicable law. (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1229.) Thus, we find defendant's argument to be unpersuasive, because we must presume the trial court followed the law.

Next, defendant asserts the trial court erred because it incorrectly believed it had to allow the People to present the prior offense evidence due to defendant pleading not guilty and placing every element of the offense at issue. Defendant's argument is not persuasive because this court reviews rulings, not the reasons for the rulings, and therefore, we will not find an error if the ruling is correct on any basis. (*People v. Geier* (2007) 41 Cal.4th 555, 582.) As set forth *ante*, there was a reasonable basis for the trial court's evidentiary ruling.

### D.    DAVIS'S BELIEFS ABOUT DEFENDANT

#### 1.    *PROCEDURAL HISTORY*

During Davis's direct examination the following exchange took place:

"[Prosecutor]: What are you thinking—as you're understanding the scene and understanding what the call was about—what are you thinking at this point?

"[Davis]: First off that—through my head—is probably burglarizing something [*sic*].

"[Defense Counsel]: Objection, speculative. Move to strike.

"The Court: Overruled.

"[Prosecutor]: You're thinking this could possibly be a burglary suspect?

"[Davis]: Correct.

"[Prosecutor]: What about the person or the description that you heard about this person led you to believe that this could be a burglary suspect?

"[Davis]: Well, the pillow[case] primarily. People will burglarize houses, take pillow[cases] from the homes and put the stolen property inside pillow[cases]. So that was the first thought that went through my head."

As Davis's testimony continued, the following exchange occurred:

"[Prosecutor]: Would you interact with somebody differently who is on parole as opposed to somebody who is not on parole?

"[Davis]: I would.

"[Prosecutor]: Describe how that works.

"[Davis]: Well, when someone's on parole, you know they have been to state prison. I would treat someone who I know has been to state prison—I would treat them differently than someone that didn't, just because, you know, if they've been to state prison that it's a hard life.

"[Defense Counsel]: Objection. Speculation, foundation. Move to strike.

"The Court: Overruled.

"[Prosecutor]: Are you a little more cautious with people on parole?

"[Davis]: I am.

"[Prosecutor]: Are you concerned for your safety more so dealing with somebody on parole as opposed to somebody who is not on parole?

"[Davis]: Yes."

2.    *ANALYSIS*

Defendant contends the trial court erred by permitting Davis to testify about his beliefs that defendant was (1) likely trying to commit a burglary, and (2) an especially dangerous person due to having been incarcerated.  Defendant asserts the evidence was "based on speculation and lacked foundation."[5]  We disagree.

"If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is:  (a) Rationally based on the perception of the witness; and (b) Helpful to a clear understanding of his testimony."  (Evid. Code, § 800.)  "The admission of a layperson's opinion testimony lies in the discretion of the trial court and will not be disturbed '"unless a clear abuse of discretion appears.  [Citation.]"'  [Citation.]" (*People v. Brown* (2001) 96 Cal.App.4th Supp. 1, 33.)

Section 69 requires the prosecutor to prove the deputy was "performing any duty imposed upon such officer by law."  Section 148, subdivision (a)(1), requires the prosecutor to prove the deputy was discharging or attempting "to discharge any duty of his or her office or employment."  Davis opined about defendant likely trying to commit a burglary because that testimony explained why Davis felt the need to stop and speak

---

[5]  The People assert defendant forfeited this argument because on appeal he is asserting the trial court erred due to the evidence inflaming the jury, which was not the basis for the trial court objection.  The People appear to be mixing defendant's error argument with his prejudice argument.  On appeal, defendant is asserting the trial court erred by admitting the evidence because it was speculative and lacked foundation, and that the error was prejudicial because the evidence inflamed the jury.  Therefore, we disagree that defendant forfeited this argument for appeal because the error argument is the same as that raised below.

to defendant. Davis explained that his opinion was based on his perception of the situation, e.g., defendant was carrying a pillowcase and pillowcases are often used to carry items out of houses. Thus, Davis's burglary opinion could reasonably be admitted as a layperson's opinion testimony because (1) it was rationally based on Davis's perception, and (2) it clarified the material issue of why Davis felt stopping defendant was a part of his job duties.

As to Davis's opinion that parolees are more dangerous people, Davis was explaining why he performs his job duties in a particular manner—why he is more cautious around parolees. Davis's testimony helped to clarify the material issue of whether Davis was lawfully performing his duties, because it provided context to the interaction between Davis and defendant. If the testimony jumped from defendant walking down the street to Davis patting down defendant, then the jury likely would have been confused. The jury needed to understand that Davis believed defendant may have been planning a burglary, and that Davis felt the need to pat-down defendant, due to parolees being a more dangerous class of people. In sum, the trial court had a reasonable basis for overruling defendant's objections, and therefore we conclude the court did not abuse its discretion.

Defendant asserts the trial court erred because witnesses may only testify to matters within their personal knowledge. (Evid. Code, § 702, subd. (a).) Defendant contends Davis's opinion testimony was problematic because it was not based solely on Davis's observations, but also on the information Davis received from the dispatcher. Defendant's argument is not persuasive because Davis testified that his opinion was

28

based upon observing the pillowcase, in that the pillowcase immediately made him believe defendant was plotting a burglary. Davis personally saw defendant walking with a pillowcase. Accordingly, Davis's testimony was based on events he personally observed, i.e., defendant walking down the street with a pillowcase.

E.     PROSECUTORIAL MISCONDUCT

1.     *PROCEDURAL HISTORY*

During closing argument, defense counsel said, "And for as violent or crazy of a struggle [as] this appeared to be, [Davis] and Deputy Broda walked out unscathed, but [defendant] ended up in the hospital for three days. So I think it's pretty clear what did, in fact, happen. And it was very much excessive force."

At the beginning of the prosecutor's rebuttal closing argument, he said, "[Defendant] was in the hospital for an elevated heart rate. And what causes elevated heart rates? I submit to you folks, swallowing a gram of methamphetamine. That's why he was in the hospital. You are going to see the pictures. Is that somebody who got the hell beat out of him? Somebody with 'Try me' tattooed on his eyelids? Try me?" At that point, defense counsel objected, saying, "Objection, improper—" The trial court overruled the objection. The prosecutor resumed his argument saying, "Try me. That's this defendant. Try me."

2.     *ANALYSIS*

Defendant contends the prosecutor committed misconduct by arguing that a person with the words "try me" tattooed on his eyelids was not a victim of excessive

29

force.  Defendant asserts that portion of the prosecutor's argument was irrelevant and inflammatory.  We disagree.

"Under the federal Constitution, a prosecutor's behavior deprives a defendant of his rights 'when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'  [Citations.]  Conduct that falls short of that standard 'may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury.'  [Citations.]"  (*People v. Gamache* (2010) 48 Cal.4th 347, 370-371.)

"[A] prosecutor is given wide latitude during argument.  The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. . . .  [Citation.]  A prosecutor may vigorously argue his case[.]  [Citations.]  To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.  [Citation.]"  (*People v. Gamache*, *supra*, 48 Cal.4th at p. 371, internal quotations omitted.)

Defendant's tattoos were part of the photographs submitted as evidence.  The prosecutor commented on defendant's tattoos when explaining to the jury that it was unlikely defendant was in the hospital for three days due only to the actions of the deputies.  The prosecutor believed that if a person with "try me" tattooed on his eyelids were put in the hospital for three days due to a fight, then the other people involved in the fight would not have walked away so easily.  The prosecutor's point was that

30

defendant was in the hospital due to ingesting a gram of methamphetamine—not due to excessive brutality on the part of the deputies.

In commenting on defendant's tattoos, the prosecutor was citing evidence and giving his interpretation of that evidence. Therefore, the prosecutor's comments were not misconduct, because it is unlikely that the jury understood the comments to be anything other than the prosecutor expressing his belief that a person with "try me" tattooed on his eyelids would not be in a hospital for three days due solely to a fight, when the other people involved in the fight walked away relatively unscathed.

Defendant asserts the prosecutor committed misconduct because he told the jury to use defendant's tattoos as propensity evidence—evidence that defendant "is the kind of person who resists arrest and needs to be dealt with by extreme methods." We are reviewing the argument to determine whether there is a reasonable likelihood the jury applied the comments in an improper manner. The context of the prosecutor's statements causes defendant's interpretation of the statements to be unreasonable. The prosecutor discussed defendant's tattoos to explain why defendant was in the hospital for three days, and how it was unlikely that defendant was in the hospital due solely to the fight with the deputies. Defendant's interpretation of the prosecutor's statements appears to lift the statements entirely out of context, which is not reasonable. Thus, we find defendant's argument to be unpersuasive.

F.    INITIAL DETENTION INSTRUCTION

    1.    *PROCEDURAL HISTORY*

The trial court instructed the jury with CALCRIM No. 2670, which provides, in relevant part:  "A peace officer is not lawfully performing his or her duties if he or she is unlawfully arresting or detaining someone or using unreasonable or excessive force when making or attempting to make an otherwise lawful arrest or detention.  [¶]  A peace officer may legally detain someone if the person consents to the detention or if: [¶]  1. Specific facts known or apparent to the officer lead him or her to suspect that the person to be detained has been, is, or is about to be involved in activity relating to crime; [¶] AND [¶] 2. A reasonable officer who knew the same facts would have the same suspicion.  [¶]  Any other detention is unlawful.  [¶]  In deciding whether the detention was lawful, consider evidence of the officer's training and experience and all the circumstances known by the officer when he or she detained the person."

    2.    *ANALYSIS*

Defendant asserts the jury was incorrectly instructed with CALCRIM No. 2670 because there is not substantial evidence supporting the theories that defendant consented to the detention or that Davis had a reasonable suspicion defendant was involved in criminal activity.  We disagree.

"'[A] trial judge must only give those instructions which are supported by substantial evidence[.]'  [Citations.]"  (*People v. Larsen* (2012) 205 Cal.App.4th 810, 823.)  "Substantial evidence in this context '"is 'evidence sufficient "to deserve consideration by the jury," not "whenever *any* evidence is presented, no matter how

weak."'" [Citations.]' [Citation.]" (*Ibid.*) We review alleged instructional errors de novo. (*People v. Burch* (2007) 148 Cal.App.4th 862, 870.)

We first address the consent portion of CALCRIM No. 2670. Davis testified that a person on parole is "still sentenced" and had surrendered his right to search and seizure. Davis explained, "[I]f you're on parole you're subject to search without cause." Davis stated that he recognized defendant as an active parolee when defendant was walking down the street, because defendant's photograph was included in a binder or database of active parolees in the Rubidoux area, which Davis frequently reviewed. After the incident with defendant, Davis verified that defendant was on parole at the time of the incident. The foregoing is substantial evidence that defendant consented to being stopped and searched when he accepted the terms of his parole. Thus, the trial court could properly instruct the jury with CALCRIM No. 2670.

Second, as to Davis's reasonable suspicion defendant was involved in committing a crime, Davis explained his belief that defendant was planning a burglary. Davis was dispatched following a 911 call from a woman who had a man knock on her door, ask for an electrical cord for a lawnmower, and who claimed to live next door in a vacant house. Defendant matched the description of the man who knocked on the woman's door, and he was walking down the street where the woman's house was located. Defendant was carrying a pillowcase as he walked down the street. Due to the pillowcase, Davis believed defendant might be planning to burglarize a house because, "[p]eople will burglarize houses, take pillow[cases] from the homes and put the stolen property inside pillow[cases]."

33

The foregoing evidence reflects suspicious behavior on defendant's part. Knocking on a person's door and claiming to live in a vacant house, followed by walking down the street with a pillowcase, are activities that would cause a reasonable person to suspect defendant was involved in criminal activity. Thus, the record includes substantial evidence from which the jury could reasonably conclude Davis suspected defendant had been or was about to be involved in activity relating to crime, and that a reasonable officer who knew the same facts would have the same suspicion. Accordingly, the trial court did not err by instructing the jury with CALCRIM No. 2670.

G.  SEARCH AND ARREST INSTRUCTION

Defendant contends the trial court erred by instructing the jury with CALCRIM No. 2670 because it only gave the jury information about lawful detentions. Defendant asserts that since he was accused of resisting an officer during a detention and search, the jury also needed to be instructed on the law related to a proper search. We disagree.

CALCRIM No. 2673 describes lawful pat-down searches. The bench notes for CALCRIM No. 2673 read only, "The court may give this instruction on request." It does not appear from the record that the defense requested CALCRIM No. 2673. Nevertheless, to the extent the trial court has a sua sponte duty to instruct with CALCRIM No. 2673, we conclude an error did not occur in this case.

As set forth *ante*, "'[A] trial judge must only give those instructions which are supported by substantial evidence . . . .' [Citations.]" (*People v. Larsen*, *supra*, 205 Cal.App.4th at p. 823.) Davis testified that he was placing defendant's hands behind his

34

back in order to begin the pat-down when defendant "pulled his arms free from [Davis's] grasp, shoved [Davis], and ran . . . away." Thus, Davis was not patting-down defendant when defendant broke away and ran. Rather, Davis was holding defendant's arms behind defendant's back. Given the foregoing evidence, we conclude the trial court did not err by not instructing the jury with CALCRIM No. 2673, because a search was not taking place.

## H. SECTION 834, SUBDIVISION A

Defendant asserts the trial court erred by including information about section 834a in the CALCRIM No. 2670 instruction. The portion of CALCRIM No. 2670 defendant is alleging to be erroneous is as follows: "If a person knows, or reasonably should know, that a peace officer is arresting or detaining him or her, the person must not use force or any weapon to resist an officer's use of reasonable force." (CALCRIM No. 2670; § 834a.) Defendant asserts this portion of the instruction gives the erroneous impression that a person may never use force against a law enforcement officer, even in the situation where the law enforcement officer is conducting an unlawful arrest. Defendant contends this is problematic because it was undisputed that he used force against Davis, and therefore this instruction "had the effect of eliminating the lawful performance element of the resisting charges." We disagree.

A defendant has a right to have the jury determine every element of the charged offenses. (*People v. Flood* (1998) 18 Cal.4th 470, 480-481.) "We determine whether a jury instruction correctly states the law under the independent or de novo standard of review. [Citation.] Review of the adequacy of instructions is based on whether the trial

court 'fully and fairly instructed on the applicable law.' [Citation.] "'In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' [Citation.] 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

If a trial court includes the section 834a law when instructing the jury about resisting arrest in a case involving allegations of excessive force, then the trial court must explain to the jury that the person being arrested "has the right to use reasonable force to protect himself." (*People v. White* (1980) 101 Cal.App.3d 161, 168.) The trial court can fulfill this duty by instructing the jury on the law of self-defense. (*Ibid.*)

In the instant case, the trial court instructed the jury on the law of self-defense with CALCRIM No. 3470. Additionally, within CALCRIM No. 2670, the trial court instructed the jury, "If a peace officer uses unreasonable or excessive force while detaining or attempting to detain a person, that person may lawfully use reasonable force to defend himself or herself." Given that the jury was told about defendant's right of self-defense in two separate instructions, it is likely the jury understood defendant had the right to defend himself from excessive force and that he did not have to simply submit to unlawful force or arrest by the deputy.

36

The argument presented by defendant isolates one section of CALCRIM No. 2670. We cannot read the instruction in isolation. We must read the instructions as a whole. In this case, the jury was given plentiful information about the law of self-defense. Therefore, defendant's isolation of a few lines from one instruction is not persuasive because he does not look at the instructions in a holistic manner.

## I.    EX PARTE JURY RESPONSES

### 1.    *PROCEDURAL HISTORY*

After closing arguments, defendant agreed that he did not need to be present if the jury submitted a question and everyone agreed on an answer. However, the trial court said, "If something comes up that's important like they're talking about verdicts or not being able to reach verdicts or something like that, and your attorney wants you because she wants to hear from you, we'll get you here. Okay?" Defendant responded, "Okay."

On July 12, 2011, at 2:26 p.m., the jury submitted a question. The jury asked, "What is the legal definition of 'use of force and violence?' (As referenced in element 1 of Count 1)[.]" The trial court contacted trial counsel via telephone, and counsel agreed with the trial court's response. The trial court responded, in writing, "Reread my first instruction."

On July 13, 2011, the jury submitted questions at 9:47 a.m., 10:49 a.m., 10:50 a.m., and 2:00 p.m. The trial attorneys were only contacted for purposes of answering the question posed at 2:00. The comment received at 9:47 a.m. read, "Cannot reach [unanimous] decision on Count 1 after much deliberation." The trial court responded,

37

"Keep working." At 10:49 a.m., the jury asked to hear portions of Davis's testimony. The trial court responded, "Ok." At 10:50 a.m., the jury asked, "What does the law state about touching an officer who is performing his legal duty? Is breaking free of the officer considered 'use of force' when a person is detained for search?" The trial court responded, "That is the question."

At 2:00, the jury submitted the following question, "#3500 says 'You must not find the defendant guilty unless you all agree . . . ' #3550 states 'If you are able to reach a [unanimous] decision on only one or only some of the charges, fill in that verdict form only . . .' We cannot come to a [unanimous] decision on Count 1. Therefore do we complete the 'Not Guilty' verdict form for Count 1, or leave blank since we cannot come to an agreement?" The trial court responded, "Wait—we will talk."

After the 2:00 question was received, the trial court contacted the trial attorneys. The trial attorneys and defendant were present in court when the trial court brought the jurors into the courtroom. At that point, the jury had reached verdicts on Counts 2 and 3, and submitted the verdict forms to the court's bailiff. The trial court asked the jury foreperson about the first question that was submitted. The trial court said, "I think your first question [was], 'What does force and violence mean?'" The trial court explained that it responded with the answer that there is no legal definition and the ordinary definitions should be applied.

Next, the trial court said the jury submitted a note reflecting it could not reach a verdict, and the court responded by telling them to continue working. Then the trial court described the jury's request for Davis's testimony to be read back. The court explained that it authorized the read back. The foreperson confirmed the read back took place. The trial court then described the note wherein the jury asked if breaking free from an officer's grasp is considered use of force. The trial court stated it responded by telling the jury, "[T]hat's a question you have to answer."

The trial court then reached the jury's question about CALCRIM No. 3500, which concerns unanimity. Upon looking at the jury's question, the trial court asked the prosecutor if he had a copy of CALCRIM No. 3500 in front of him, which the prosecutor did not. The trial court read CALCRIM No. 3500 aloud, which concerned the jury agreeing to the specific act that comprised Count 1. The trial court spoke to the foreperson, who clarified the jury could not agree on whether defendant's pushing Davis's hands constituted force.

The jury was split "[n]ine, two, and one," and had been split in that manner for approximately one day, with no one changing his or her mind. The trial court asked if there was anything it could do to assist the jurors. The foreperson responded, just answering the questions the jury submitted. The foreperson asked for clarification regarding one of the trial court's responses. The foreperson asked, "What does the law say about if an officer has somebody detained, what can a person that's detained do to that officer? Can they do anything? Or if they react in any way outside of compliance,

39

that's what we were—again, is that force?  So they willfully pull away without being instructed to do so by the officer?"

The trial court clarified that the question concerned the meaning of the term force.  The following exchange then took place:

"The Court:  Force means force.  Go back to work.

"[Foreperson]:  We understand that, but that's not changing the minds of some.

"The Court:  Go back.  And force means force.  It doesn't have lots, it does not have small, it doesn't have anything.  It's just force.  That's all it is.  Is force used?  So you go out and figure out what force means.  If you cannot figure out what force means, we picked 12 people that are not as smart as we thought.  Go.  Take your notebooks.  We ain't done folks.  Keep working."

At that point, the jury left to resume its deliberations.  Sixteen minutes later, the jury returned a verdict for Count 1.

    2.  *ANALYSIS*

Defendant asserts the trial court violated his rights of due process and assistance of counsel by responding to the jury's questions ex parte.  Specifically, defendant focuses on (1) the 9:47 a.m. comment about not being able to reach a unanimous verdict, to which the trial court responded, "Keep working"; and (2) the 10:50 a.m. question about what the term "force" means and whether breaking free from a law enforcement officer's grasp could be considered force, to which the trial court responded, "That is the question."  The People assert (1) defendant waived this issue by

40

not raising it at the trial court, and (2) any error was harmless.  We choose to address the merits of defendant's argument, and conclude the trial court did not err.

Section 1138 provides:  "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court.  Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."  Thus, a judge is not permitted to have private communications with the jury unless defendant and the prosecutor have agreed to such communications.  (*Bradford*, *supra*, 154 Cal.App.4th at p. 1413.)  These private communications are generally not permitted because a defendant needs to be given the opportunity to (1) evaluate the proposed judicial response to a jury question, (2) make an objection to the proposed response, and (3) suggest a different response that may be more favorable to the defendant.  (*Ibid.*)

"When the jury's inquiry arises in a situation where 'counsel could have taken some action on the defendant's behalf to amplify, clarify, or modify the supplemental instruction or procedure,' a 'court's failure to give notice or afford an opportunity to respond [to the jury's inquiry] . . . constitute[s] statutory as well as constitutional error.' [Citation.]"  (*Bradford*, *supra*, 154 Cal.App.4th at p. 1413.)

The comment received at 9:47 a.m. read, "Cannot reach [unanimous] decision on Count 1 after much deliberation." The trial court responded, "Keep working." When the trial court gathered defendant, defense counsel, the prosecutor, and the jury in the courtroom, at approximately 2:30 p.m., the foreperson said the jury was still deadlocked on Count 1 and no one had changed their minds since they started deliberating the previous day. The trial court then discussed the issue with the jury while defendant, defense counsel, and the prosecutor were present. Thus, while the trial court may have engaged in an ex parte communication with the jury by responding "keep working," the court ultimately spoke to the jury about the problem while counsel and defendant were present, and before any jurors had changed their minds about the situation. During the conversation, defense counsel did not object or raise any concerns about the trial court's remarks. Accordingly, we conclude the trial court did not err, because to the extent any error may have occurred with the note to the jury, the trial court cured the mistake by gathering everyone together for a discussion before any jurors changed their positions regarding Count 1.

The same reasoning applies to the 10:50 a.m. question in which the jury asked, "What does the law state about touching an officer who is performing his legal duty? Is breaking free of the officer considered use of force when a person is detained for search?" The trial court responded in writing, "That is the question." When the trial court gathered everyone together in the courtroom, the foreperson again asked whether defendant breaking away from Davis constituted force. As set forth *ante*, a conversation took place regarding force having a plain, non-legal meaning. During that

42

conversation, defense counsel did not object or make any suggestions as to how the trial court could better answer the jury's question.

So again, given that the jurors were still deadlocked on Count 1 in the same positions they had been since deliberations began, any error the trial court made by responding in writing to the jury was cured by gathering everyone together in the courtroom for a discussion of the same question raised in the 10:50 a.m. note. Thus, we conclude the trial court did not err, because any error was fixed below.

Defendant's argument focuses on the trial court's written responses to the jury's questions, and ignores the conversation that took place with everyone present in the courtroom. Given that the trial court discussed the issues in the jury's notes with everyone present in the courtroom, prior to any jurors changing their minds about Count 1, we find defendant's argument to be unpersuasive.

Next, defendant asserts counsel did not have an opportunity to object or make a suggestion about the trial court's responses to the jury because the trial court began speaking to the foreperson as soon as everyone was gathered together in the courtroom. Defendant asserts his counsel should have been given the trial court's *proposed* answers to the jury's questions, and anything less is a violation of his rights. We do not find this argument to be persuasive because when the trial court gathered everyone together in the courtroom there was a conversation about the status of the jury's deliberations— such as where they stood on all three counts—prior to the court delving into the jury's questions. If defense counsel wanted to speak to the trial court outside the presence of the jury, there was ample opportunity to raise an objection or request a chambers

43

conference.  The trial court did not blindside counsel by immediately responding to the jury's questions the moment everyone gathered in the courtroom.  As a result, we find defendant's argument to be unpersuasive.

J.      COERCING THE JURY

Defendant contends the trial court erred by coercing the jury into reaching a verdict for Count 1.[6]  The People assert defendant has failed to preserve this claim of judicial misconduct and that the trial court's comments were not coercive.  We choose to address the merits of defendant's contention because the issue is easily resolved.

Section 1140 provides:  "Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless by consent of both parties, entered upon the minutes, or unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree."

Our Supreme Court has provided further insight into this rule:  "'Although the court must take care to exercise its power without coercing the jury into abdicating its independent judgment in favor of considerations of compromise and expediency [citation], the court may direct further deliberations upon its reasonable conclusion that such direction would be perceived "'as a means of enabling the jurors to enhance their understanding of the case rather than as mere pressure to reach a verdict on the basis of

---

[6] The procedural history for this issue is set forth *ante*; we do not repeat it here.

44

matters already discussed and considered.'"'" [Citation.]" (*People v. Bell* (2007) 40 Cal.4th 582, 616.)

In the instant case, the trial court discussed the meaning of the term "force" with the jurors prior to returning them to their deliberations. The trial court seemed to suggest that the jurors were overcomplicating the term—looking for a legal definition when the ordinary definition applied. The trial court reminded the jury of the question they needed to answer, "Is force used?" Thus, the trial court's comments were not coercing the jury to reach a verdict. Notably, the trial court took great care to not have the votes revealed as far as guilt or innocence were concerned. Thus, the trial court had no insight as to whether the 9-2-1 split was leaning toward guilt or innocence. The trial court simply wanted the jury to continue its discussions with a greater understanding of the term "force" and the task at hand.

Moreover, the jury's deliberations began at 11:24 a.m. on July 12 and ended at 4:00 p.m. that day. The next day, deliberations began at 9:40 a.m. and the conversation with the trial court took place at 2:34 p.m. Thus, assuming the jurors never took a break, they had been deliberating for only nine and a half hours when the trial court instructed them to resume deliberations. Our Supreme Court has upheld trial courts' denials of mistrials after fruitless deliberations lasting longer than 10 hours. (*People v. Bell*, *supra*, 40 Cal.4th at p. 617.) Accordingly, the trial court did not return the jury to lengthy deliberations that had been going on for multiple full days. In sum, we conclude the trial court did not coerce the jury. Rather, the trial court enhanced the jury's understanding of the case and returned them to their deliberations.

45

Defendant contends the trial court coerced the jury because the jury understood on the first day of deliberations what the term "force" meant, and was at an impasse over whether defendant's conduct qualified as force. Defendant argues, "[T]he court's telling the jury to 'go out and figure out what force means' was nothing more than a demand that the jurors agree on whether force was used." Defendant combines this with the trial court's comments about the jurors not being terribly smart if they did not understand the word "force," and concludes the trial court "went beyond coercion" and was "bullying" the jury.

Defendant's argument is not persuasive because during the discussion in the courtroom, the foreperson asked the trial court, "What does the law say about if an officer has somebody detained, what can a person that's detained do to that officer? Can they do anything? Or if they react in any way outside of compliance, that's what we were—again, *is that force*? So they willfully pull away without being instructed to do so by the officer." (Italics added.) The trial court's response clarified that there was no special legal definition of the term, and it was the jury's task to decide if the facts presented amounted to "force" under the common meaning of the term. Thus, the trial court clarified an issue in the case for the jury and returned them to their deliberations. The trial court did not coerce or bully the jury.

K.  CUMULATIVE ERROR

Defendant asserts the foregoing 10 alleged errors combined to create a denial of due process. Thus far we have concluded the trial court and prosecutor did not err. Therefore, defendant's "cumulative effect" argument is unpersuasive. (See *In re Reno*

46

(2012) 55 Cal.4th 428, 482 [rejecting a cumulative effect argument where no errors were found].)

## L.    LESSER INCLUDED OFFENSE

Defendant asserts his Count 2 conviction for violating section 148, subdivision (a)(1) must be reversed because it is a lesser included offense of section 69, which he was convicted of in Count 1, and the two convictions are based upon the same conduct.

The People dispute that section 148, subdivision (a)(1) is a lesser included offense of section 69, and fault defendant for relying on the prosecutor's closing argument and jury instructions in making his point about the lesser included offense—as opposed to the statutory elements or charging document.

"The definition of a lesser necessarily included offense is technical and relatively clear.  Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser."  (*People v. Birks* (1998) 19 Cal.4th 108, 117.)

For reference we provide the language of the two statutes.  Section 69 provides: "Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law, or who knowingly resists, by the use of force or violence, such officer, in the performance of his duty, is punishable" by a fine, imprisonment, or both.

47

Section 148, subdivision (a)(1), provides: "Every person who willfully resists, delays, or obstructs any . . . peace officer . . . in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine," imprisonment, or both.

There is a split of authority in the Courts of Appeal as to whether resisting a peace officer (§ 148, subd. (a)(1)) is a lesser included offense of resisting an executive officer (§ 69). (*People v. Lacefield* (2007) 157 Cal.App.4th 249, 257 (*Lacefield*); *People v. Belmares* (2003) 106 Cal.App.4th 19, 24 (*Belmares*), disapproved on another ground in *People v. Reed* (2006) 38 Cal.4th 1224, 1228.) We conclude that we are able to reconcile the reasoning of the two seemingly opposing cases, because the alleged split appears to have occurred due to the two different offenses included in section 69. (See *In re Manuel G.*, *supra*, 16 Cal.4th at p. 814 [discussing the two different offenses].)

In *Lacefield*, the Second District, Division Eight, focused on the second offense in section 69—resisting an executive officer—and concluded that resisting a peace officer (§ 148, subd. (a)(1)) is a lesser included offense of resisting an executive officer (§ 69). (*Lacefield*, *supra*, 157 Cal.App.4th at p. 255-257.) The court applied the statutory elements test—comparing the elements of section 148, subdivision (a)(1), with the elements in the second half of section 69—and determined that "it appears to be impossible to violate the second type of offense in section 69 without also violating section 148(a)(1), which means that section 148(a)(1) is a lesser included offense of the second type of offense in section 69." (*Lacefield*, at p. 257) The court explained that

48

both statutes included the same temporal element, because the officer had to be performing an official duty when the crime occurred. (*Ibid.*) Additionally, both statutes "require resistance, although section 148(a)(1) also refers to delay or obstruction." (*Ibid.*)

In *Belmares*, District Five focused on the first portion of section 69—deterring or preventing an executive officer from performing an official duty—and concluded that resisting a peace officer (§ 148, subd. (a)(1)) is not a lesser included offense of deterring an executive officer. (*Belmares*, *supra*, 106 Cal.App.4th at p. 24.) When the reviewing court applied the statutory elements test, it concluded that the temporal elements of sections 69 and 148 are different. (*Belmares*, at p. 24.) The court explained that "one can deter an officer's duty *in the future* (§ 69) without resisting the officer's discharge or attempted discharge of a duty *at that time*." (*Ibid.*)

We conclude that the reasoning of both *Lacefield* and *Belmares* is correct, i.e., that resisting a peace officer (§ 148, subd. (a)(1)) *is not* a lesser included offense of the first crime defined in section 69—deterring an executive officer (*Belmares*); however, resisting a peace officer (§ 148, subd. (a)(1)) *is* a lesser included offense of the second crime defined in section 69—resisting an executive officer (*Lacefield*).

In the instant case, defendant was charged with both deterring and resisting Deputy Davis. However, the jury was instructed only on the law of resisting an executive officer by force or violence. (CALCRIM No. 2652.) Accordingly, we conclude defendant was found guilty of the second type of offense in section 69. Therefore, we follow the reasoning of *Lacefield* and conclude that section 148,

subdivision (a)(1), is a lesser included offense of the crime for which defendant was convicted (§ 69).

Defendant asserts he could not be convicted of both the greater and lesser offense because "the exact same conduct" formed the basis for the two convictions. "California law prohibits convicting a defendant of two offenses arising from a single criminal act when one is a lesser offense necessarily included in the other." (*People v. Montoya* (2004) 33 Cal.4th 1031, 1033.) The prosecution's closing argument theory of the case was that defendant's act of shoving Davis's hands away constituted the section 69 charge, while defendant's act of running away from Davis constituted the section 148 charge. However, in the section 148 jury instruction, the jury was informed of the following prosecution theory concerning the section 148 charge: "The People allege that the defendant resisted, or obstructed, or delayed Deputy Davis by doing the following: forcefully resisting arrest, violently resisting arrest, running away, swallowing methamphetamine."

Given the language of the jury instruction, the two crimes overlap. We cannot distinguish the section 148 criminal act from the section 69 criminal act because the jury instruction for section 148 went beyond defendant's act of running away and included defendant's acts of "violently resisting arrest," which would encompass the acts of pushing the deputy's hands away. Given this instruction, we must conclude the two crimes arose from the same criminal act. Therefore, defendant cannot be convicted of both the greater and lesser offense. (*People v. Ramirez* (2009) 45 Cal.4th 980, 984; see also *People v. Villa* (2007) 157 Cal.App.4th 1429, 1434 ["[A] defendant cannot be

convicted of both robbery and theft arising from the same course of conduct"].)
Accordingly, defendant's section 148 conviction must be reversed.

Defendant was sentenced to a concurrent county jail term of 180 days for the section 148 conviction. The section 148 conviction does not appear on the second amended abstract of judgment, so the document does not need to be amended due to our disposition.

The People assert the trial court did not err because (1) the statutory elements test reflects section 148, subdivision (a)(1) is not a lesser included offense of section 69, and (2) defendant's "act of running was entirely distinct from the force he applied at the beginning of the encounter or later when confronted in the backyard." As set forth *ante*, the statutory elements test reflects section 148, subdivision (a)(1) is a lesser included offense of the second crime defined in section 69—resisting an executive officer. As to the second assertion, the jury instruction for the section 148 offense did not limit the theory of the charge to defendant's act of running—it included his acts of violent resistance, therefore, we cannot conclude that the section 148 conviction consists of a separate criminal act.

## M. MULTIPLE PUNISHMENTS

Defendant contends the trial court erred by not staying the sentence for his section 148, subdivision (a)(1) conviction, because that conviction involved the same conduct and objective as the section 69 conviction (§ 654). Since we have reversed defendant's section 148 conviction, this contention is moot as we can offer no further relief. (*People v. Gregerson* (2011) 202 Cal.App.4th 306, 321.)

51

### N. *PITCHESS* MOTION

In defendant's opening brief, he requests this court review the reporter's and clerk's transcripts of the in-camera *Pitchess* hearing, and then reverse his convictions if we find "undisclosed discoverable information which would have had a reasonable probability of changing the outcome of the trial." The People do not object to this court reviewing the transcripts of the *Pitchess* hearing. We find nothing requiring reversal of defendant's convictions.

The statutory scheme for *Pitchess* motions is set forth in Evidence Code sections 1043 through 1047 and Penal Code sections 832.5, 832.7, and 832.8. When a trial court decides to review a peace officer's records in chambers, the trial court should "disclose to the defendant 'such information [that] is relevant to the subject matter involved in the pending litigation.' [Citation.] [¶] There are several limitations on disclosure. The trial court 'shall exclude from disclosure: [¶] (1) Information consisting of complaints concerning conduct occurring more than five years before the event or transaction which is the subject of the litigation in aid of which discovery or disclosure is sought. [¶] (2) In any criminal proceeding the conclusions of any officer investigating a complaint filed pursuant to Section 832.5 of the Penal Code. [¶] (3) Facts sought to be disclosed which are so remote as to make disclosure of little or no practical benefit.' [Citation.]" (*People v. Mooc* (2001) 26 Cal.4th 1216, 1226-1227.) "A trial court's decision on the discoverability of material in police personnel files is reviewable under an abuse of discretion standard. [Citation.]" (*People v. Jackson* (1996) 13 Cal.4th 1164, 1220-1221.)

In defendant's *Pitchess* motion, he sought "information regarding any excessive use of force, misstatements in police reports, character, habits, customs and credibility of the involved officer(s) in this case." Defendant further argued that it was unconstitutional to limit the information to a five-year time period. Defendant asserted he should be permitted access to all relevant information regardless of the time elapsed.

We have reviewed the *Pitchess* hearing transcripts. The only discoverable incident involved Davis striking Mendoza on May 26, 2007, which was disclosed to defendant. Accordingly, we conclude the trial court did not err.

## O.    DISQUALIFICATION

Defendant asserts this court should disqualify Judge Law from presiding over this case upon remand. We have have found one error, which would not require an exercise of discretion by Judge Law upon remand. Accordingly, we do not further address defendant's disqualification contention because it is moot. (*People v. Gregerson*, *supra*, 202 Cal.App.4th at p. 321 [an issue is moot when a court's ruling would have no practical effect].)

53

## DISPOSITION

Defendant's conviction in Count 2 (§ 148, subd. (a)(1)) is reversed. The trial court is directed to amend the October 5, 2011, minute order to reflect defendant does not have a sentence for Count 2. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

RICHLI
Acting P. J.

KING
J.